El Pueblo de Puerto Rico, demandante y apelado, *v.* Eusebio Santiago, acusado y apelante.

Núm. 10667.—*Sometido:* Diciembre 20, 1944. *Resuelto:* Febrero 23, 1945.

*Leopoldo Tormes García,* abogado del apelante; *R. A. Gómez, Fiscal del Tribunal Supremo y Luis Negrón Fernández, Fiscal Auxiliar,* abogados de El Pueblo, apelado; *Martín Avilés Brasero,* abogado, en representación del Departamento del Trabajo.

EL JUEZ PRESIDENTE SEÑOR TRAVIESO emitió la opinión del tribunal.

La sección 1 de la Ley núm. 114 aprobada el 7 de mayo de 1942 ((1) pág. 691), titulada "Ley para proteger a los obreros y empleados contra perjudiciales discrímenes de sus patronos, fijar penalidades por las violaciones de esta ley, y para otros fines", lee como sigue:

"Sección 1.—Todo patrono que lleve a cabo *cualquier acto de perjudicial discrimen contra sus obreros y empleados o cualquiera de ellos,* porque los mismos hayan organizado o intervenido en actividades de una unión obrera, o hayan demandado la celebración de un convenio colectivo de trabajo, o hayan participado en una huelga o en una reclamación de mejores salarios y condiciones de trabajo *o porque estén afiliados a determinado partido político,* incurrirá, en el caso de cada obrero o empleado contra quien haya realizado un acto de perjudicial discrimen, en un delito menos grave (misdemeanor), y convicto que fuere . . . etc." (Bastardillas nuestras).

La sección 2 de la misma ley dispone que será evidencia prima facie de su infracción, la "cesantía sin justa causa", por parte del patrono, de obreros o empleados contra quienes se hubiere realizado uno de los actos de perjudicial discrimen incluídos en la sección 1 de la ley.

En la denuncia radicada contra el acusado apelante se le imputa que en septiembre 30 de 1943, mientras actuaba en su calidad de mayordomo de una plantación de cañas propie-

dad de la Sucesión de Lucas P. Valdivieso, realizó un acto de perjudicial discrimen cuando "se negó a darle trabajo (en el desyerbo y otras labores de cultivo de las cañas), habiendo entonces trabajo que hacer en la mencionada Hacienda Dolores . . ., al obrero Antonio Velázquez, dejándolo cesante de su trabajo o empleo en desyerbo (que a la sazón desempeñaba), sin justa causa, a saber: por pertenecer y estar afiliado dicho obrero al Partido Popular Democrático, que es un partido político". Se alega, además, en la denuncia, que cuando el obrero Velázquez y otros fueron en el día de autos a pedir trabajo al acusado, éste les contestó que "no tendrían trabajo porque todos eran populares y él sabía que habían dado vivas al Partido Popular el día anterior y en distintas ocasiones desde el mismo *truck* en que regresaban de sus trabajos".

Vista la causa ante la Corte de Distrito de Ponce y condenado a pagar una multa de $100 o a sufrir la prisión subsidiaria, el acusado apeló para ante este tribunal. Alega en apoyo de su recurso, (1) que la sentencia es contraria a la evidencia y a la ley, y (2) que la Ley núm. 114 de 1942, aplicada 'a los hechos establecidos por la evidencia, resultaría anticonstitucional y contraria a los párrafos primero, quinto, décimosexto y décimoséptimo del artículo 2 de la Ley Orgánica de Puerto Rico y a la Constitución Federal.

Dos son las cuestiones envueltas en este recurso: (1) ¿Es la evidencia suficiente para justificar la convicción del acusado?; y (2) ¿Infringe la Ley núm. 114 de mayo 7 de 1942 alguno de los preceptos constitucionales invocados por el apelante?

Hagamos un resumen de la evidencia sometida a la consideración de la corte inferior.

Declaró como primer testigo de cargo, el obrero Antonio Velázquez y dijo: que desde hacía muchos años venía trabajando con la Sucesión Valdivieso, en la colonia "Coto", en Peñuelas; que el día de autos, cuando él venía a tomar el

truck que habría de conducirlo al trabajo, el acusado se opuso y le contestó en voz alta "que no podía tomar el truck para ir al trabajo, porque había sabido que había dado vivas al Partido Popular y la hacienda no permitía populares allí ni en sus alrededores"; que solicitaron trabajo unas cuantas veces y no se les dió "porque éramos y pertenecíamos a un partido político", al Popular Democrático; que el 29 de septiembre, 1943, día anterior al de autos, él trabajó en la colonia "Dolores", en el Barrio "Tallaboa" de Peñuelas, bajo la dirección de Rafael Santiago y del capataz Francisco Luciano; que la colonia "Coto" de la Sucesión Valdivieso queda bastante retirada de la colonia "Dolores"; que en los días anteriores al 30 de septiembre él trabajaba en la colonia "Dolores", pero para ir a dicha colonia tenía que tomar el truck frente a la casa del acusado; que lo único que él tenía que hacer el día de autos en la colonia "Coto", de la cual es mayordomo el acusado, era tomar el truck para ir a trabajar a la colonia "Dolores", donde tenía que trabajar bajo la dirección de Rafael Santiago; que quien supervisaba los trabajos que él y otros realizaban en la colonia "Dolores" era Rafael Santiago y el capataz. A nuevas preguntas del fiscal contestó: que el acusado fué quien "nos solicitó para que fuéramos a trabajar a la Hacienda 'Dolores' "; que el día 30 de septiembre él no sabía a cuál de las dos colonias se le enviaría a trabajar; que ellos iban a la colonia "Coto" y entonces el acusado los dirigía al sitio en que iban a tomar el trabajo; que era el acusado quien todos los días les designaba el sitio donde debían trabajar; que cada colonia tiene su mayordomo, pero que el capataz que llevaba a los obreros a las distintas colonias era uno solo, a quien dirigía el acusado Eusebio Santiago; que el 30 de septiembre no lo llevaron a trabajar, por la orden del acusado.

El obrero Félix Santiago declaró que él trabajaba también para la Sucesión Valdivieso; que el 30 de septiembre "yendo en un truck de la hacienda, nos suspendieron del

trabajo, porque veníamos gritando a los Populares''. Preguntado dos veces por el fiscal, sobre las manifestaciones que hiciera en aquel momento el acusado, el testigo respondió: ''que nos suspendió''. Continuó declarando, que está trabajando allí bajo la dirección del acusado, pero estuvo cuatro meses sin trabajar; que después él fué a pedir trabajo y se lo dieron; que allí el trabajo escasea; que cuando no hay trabajo y hay muchos trabajadores, se les suspende el trabajo a unos y se les da a otros; que antes del día 30 de septiembre él trabajaba diariamente en la colonia ''Dolores'', de la cual es mayordomo Rafael Santiago y capataz un tal Luciano; y que el acusado es mayordomo de la colonia ''Coto''.

Blas Colón, trabajador de la hacienda ''Dolores'', relató el incidente así: ''Los trabajadores que estábamos allí, nos acercamos a la plaza, frente a la casa de Eusebio Santiago, para tomar un truck para ir a trabajar a la hacienda ''Dolores'' y entonces el señor Eusebio Santiago nos gritó en voz alta que para nosotros no había trabajo, porque nosotros éramos Populares''; que eso pasó en la colonia ''Coto'' de la Sucesión Valdivieso; que ese día no le dieron trabajo; que el encargado de mandarlos a trabajar a una u otra de las dos colonias era el acusado; que él trabajaba bajo las órdenes del acusado, que era quien les daba trabajo y les asignaba el sitio; que después de ese día no ha vuelto a trabajar en ningún sitio de la Sucesión Valdivieso.

En igual sentido que los anteriores declararon tres testigos más.

Como testigo de defensa, Carlos J. Aguayo, Jefe de Cultivo de la Sucesión Valdivieso, declaró: que entre la colonia ''Dolores'' y la colonia ''Coto'' hay una distancia de cinco kilómetros; que el mayordomo de la ''Coto'' es el acusado y el de ''Dolores'' Rafael Santiago; que los trabajadores para cada una de dichas colonias son empleados por el mayordomo de cada colonia; que el 30 de septiembre Eu-

sebio Santiago, el acusado, no tenía absolutamente nada que ver en la colonia "Dolores"; que el día de autos el obrero Antonio Velázquez estaba trabajando con Rafael Santiago, en la colonia "Dolores"; que ese día no se trabajó en ninguna de las dos colonias por la lluvia excesiva, pues el día 29 llovió bastante, en toda la jurisdicción de Peñuelas y él fué quien ordenó que se pararan todos los trabajos.

Rafael Santiago, mayordomo de la colonia "Dolores", declaró que Antonio Velázquez trabajaba allí bajo su dirección; que el declarante era quien ordenaba la forma de trabajar en la "Dolores", siendo él el responsable a los dueños de la finca; que el acusado nada tenía que ver con la hacienda "Dolores" y sólo podía emplear gente para la colonia "Coto"; que el 30 de septiembre, 1943, no se empleó gente para el desyerbo por razón de la lluvia y que fué él quien por instrucciones de su jefe Carlos J. Aguayo ordenó a los capataces que no trajeran la gente a trabajar; y que el trabajo quedó suspendido por dos o tres días.

Declarando en su propia defensa, el acusado dijo: Que el día de autos, como a las seis y media de la mañana, llegaron Velázquez y otros obreros, llegando en seguida el truck. Ya él tenía orden de sus jefes de que no mandara gente, porque había llovido mucho y no se podía trabajar hasta nuevo aviso; que él suspendió el trabajo, diciéndoles que tenía órdenes del mayordomo; que las palabras que él les dijo fueron: "por hoy no hay trabajo", a lo que ellos contestaron: "eso será porque nosotros no estamos con ustedes", y él les replicó: "No hay trabajo, porque ha llovido y la hacienda me ha llamado"; que quien tenía que emplearlos era Rafael Santiago, pues él era el encargado de los trabajos en la "Dolores" y fué Rafael Santiago quien le ordenó que no le mandara gente ese día por lo mucho que había llovido.

Los hechos alegados en la denuncia, que consideramos esenciales y deben por lo tanto quedar probados fuera de toda duda razonable, son:

1. Que el acusado era o actuaba como mayordomo, con facultad para emplear y despedir a los obreros de la Sucesión de Lucas P. Valdivieso.

2. Que el día 30 de septiembre de 1943, el acusado se negó a dar trabajo en el desyerbo de cañas al obrero Antonio Velázquez.

3. Que no existió justa causa para la negativa del acusado a dar trabajo a Velázquez ni para separarle de su empleo.

4. Que la negativa del acusado se basó únicamente en el hecho de que Velázquez estaba afiliado al Partido Popular Democrático.

La evidencia en cuanto a todos estos hechos es contradictoria. La corte resolvió el conflicto en contra del acusado y siendo la prueba de cargo, creída por la corte, suficiente para justificar la sentencia, no vemos razón alguna para alterar sus conclusiones al efecto de que el acusado actuaba como mayordomo, con facultad para emplear obreros, reducir el número de éstos y despedirlos por justa causa o cuando no hubiere trabajo en que emplearles; y que a partir del día 30 de septiembre de 1943, el acusado se negó a darle trabajo al obrero Velázquez y a otros, sin justa causa y por el solo hecho de estar dichos obreros afiliados al Partido Popular Democrático de Puerto Rico.

Siendo la Ley núm. 114 un estatuto de carácter penal, toda infracción de sus disposiciones debe ser probada más allá de toda duda razonable. La evidencia ofrecida en el presente caso cumple a nuestro juicio con ese requisito.

Habiendo llegado a la conclusión de que la evidencia es suficiente para sostener la sentencia recurrida, procederemos ahora a considerar y resolver la cuestión constitucional levantada por el apelante.

La Ley núm. 114 de 1942, inspirada sin duda alguna en el propósito fundamental de la Ley Nacional de Relaciones

Obreras, conocida como Ley Wagner (U.S.C.A. Tít. 29 (sección 151 *et seq.*)), que es el de proteger a los obreros contra las prácticas ilegales de los patronos, se diferencia de la Ley Wagner, entre otras cosas, (1) en que no se limita a proteger al obrero contra actos del patrono tendientes a castigar a sus obreros por haber participado en actividades de las organizaciones obreras, sino que va más allá y extiende su protección a las actividades políticas del obrero; y (2) en que el remedio que concede la Ley Wagner al obrero ilegalmente despedido del trabajo es la reposición en su empleo, con pago de salarios atrasados, mientras que la Ley núm. 114 deja al obrero fuera del empleo, pero hace al patrono culpable de un delito menos grave (*misdemeanor*) que podrá ser castigado con multa de cien a quinientos dólares o cárcel por un término no menor de treinta ni mayor de noventa días, o ambas penas a discreción del tribunal.

La Ley núm. 114 de 1942, no priva al patrono de su derecho a separar de su empleo a cualesquiera de sus obreros unionados o afiliados a un determinado partido, siempre que la separación o cesantía sea motivada por una justa causa. Lo único que el estatuto insular prohibe al patrono es, que pretendiendo ejercitar su reconocido derecho a despedir a sus obreros por una causa justa, abuse de ese derecho para intervenir con el obrero en el libre ejercicio de su derecho a ingresar en una unión obrera o afiliarse a un partido político, castigándole con la pérdida de su empleo.

Los obreros tienen ya firmemente reconocido y protegido por la Ley Nacional, por la legislación de una mayoría de los estados y por nuestra Ley núm. 42 de noviembre 30, 1917, su derecho a organizar y a ingresar en uniones de trabajadores, sin exponerse por ello a ser castigados por sus patronos con la pérdida del empleo. Tanto el Congreso como las legislaturas estatales y la nuestra han creído conveniente proteger a los obreros en el ejercicio de su derecho a la libertad de asociación, por creer que así solamente pue-

den los obreros conseguir para sí y para los que de ellos dependen un *standard* de vida que esté en consonancia con el bienestar nacional.

La legislatura insular, yendo aún más lejos que el Congreso y que las legislaturas estatales, ha querido garantizar al obrero el libre ejercicio de su derecho a ingresar en el partido político de su simpatía, sin que por ello se exponga a ser castigado por su patrono con la pérdida de su empleo. No habiendo llegado la legislación continental hasta el extremo indicado, las partes no han podido citar ni nosotros encontrar precedentes que puedan ayudarnos a resolver si el estatuto en cuestión está en conflicto con precepto alguno de la Ley Orgánica o de la Constitución Federal.

A nuestro juicio, los mismos argumentos y razones aducidos en favor de la constitucionalidad de la Ley Wagner, pueden ser invocados para sostener la validez constitucional del estatuto que estamos considerando. Si la ley puede, sin contravenir precepto constitucional alguno, prohibir al patrono que despida de su empleo al obrero que deseando mejorar sus condiciones de vida se afilió a una unión obrera, a menos que exista justa causa para la destitución, no vemos razón alguna por la cual no pueda prohibirse al patrono que deje cesante al obrero, sin justa causa y por el solo hecho de haberse afiliado a un determinado partido político.

El obrero, como ciudadano que es, tiene el derecho de afiliarse a aquel partido político que a su juicio habrá de tomarse mayor interés que los otros en la defensa del bienestar y de los derechos de la clase obrera. Tan sagrado y tan digno de protección es ese derecho, como lo es el de afiliarse a una unión u organización obrera. La legislatura ha querido proteger al ciudadano obrero en el ejercicio de su derecho a participar en las actividades políticas insulares, prohibiendo que se le castigue, por el solo hecho de estar afiliado a un determinado partido, con la pérdida de su empleo. No creemos que pueda sostenerse con éxito que esa

prohibición que la ley impone al patrono, priva a éste de su propiedad sin el debido proceso de ley o le niega la igual protección de las leyes. La ley reconoce el derecho del patrono a despedir al obrero por justa causa, pero provee que el solo hecho de haberse afiliado a un determinado partido político no constituirá justa causa.

*La sentencia recurrida debe ser confirmada.*